UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JAVIER ZUNIGA,                    )
                                  )
              Plaintiff           )
                                  )
         v.                       )    Case No. 2:07 cv 218
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security   )
                                  )
              Defendant           )

OPINION AND ORDER

This matter is before the court on the petition for judicial
review of the decision of the Commissioner of Social Security
filed by the plaintiff, Javier Zuniga, on October 24, 2007.  For
the reasons set forth below, the decision of the Commissioner is
**AFFIRMED.**

Background

The plaintiff, Javier Zuniga, applied for Disability Insur-
ance Benefits on January 15, 2004, alleging a disability onset
date of December 2, 2002. (Tr. 76-78)  Finding Zuniga not dis-
abled, the claim was denied on April 22, 2004.  (Tr. 39-43)
Zuniga requested a hearing before an Administrative Law Judge
("ALJ") on May 26, 2004.  (Tr. 44)  A hearing before ALJ Denise
McDuffie Martin was held on February 15, 2006, at which Zuniga,
his wife Christina Zuniga, medical expert Dr. Walter J. Miller,
M.D., and vocational expert Pamela Tucker testified.  (Tr. 19) On
April 25, 2006, the ALJ found Zuniga disabled beginning on
December 2, 2002, and ending on May 5, 2005, and awarded Zuniga

Disability Benefits for that closed period by written decision. (Tr. 19-30)  The ALJ found that after May 5, 2005, Zuniga could perform unskilled sedentary occupations in the national economy despite his physical, postural, and mental restrictions.  (Tr. 29)  Following a denial of his request for review by the Appeals Council on May 8, 2007, Zuniga filed a complaint in this court on July 3, 2007.  (Tr. 6-8, DE 1)

Javier Zuniga was born on April 4, 1972, making him 33 years old at the time of the hearing before the ALJ.  (Tr. 76)  His work history included a variety of occupations from 1992 to 2002, including cook, dishwasher, driver, laborer, landscaping, and welder positions.  (Tr. 106-07)  On December 19, 2002, while working as a truck driver, Zuniga injured his back lifting a heavy pipe.  (Tr. 136)  His medical records following the injury indicate an L4-5 disc herniation.  (Tr. 151)  Dr. Marc A. Levin performed surgery to incise and remove the herniation on January 25, 2003.  (Tr. 159)  Admission records indicate that Zuniga continued to experience radiating pain, numbness, and tingling following recovery from the first surgery and therapy, and Dr. Levin performed a second back surgery on May 20, 2003, to correct the L4 disc herniation.  (Tr. 195-201) Again, the surgery failed to relieve Zuniga of his pain.  (Tr. 214)[1]

Zuniga continued to experience pain and walked with an antalgic gait, and attempts to improve his symptoms with physical

---

[1]The record mistakenly includes several pages of physical therapy records for a Susan M. Kuftic in the section encompassing Zuniga's second post-operative period.  (Tr. 218-31)

therapy and epidural steroid injections failed due to pain and
headaches. (Tr. 235) By this time, Zuniga had taken multiple
medications to alleviate his discomfort, including Vicodin ES,
Robaxin, multiple anti-inflammatory medications, Elevil, Neuron-
tin, and Keppra, though none had succeeded in relieving his pain.
(Tr. 235) A repeat MRI revealed an L-5 disc herniation where the
previous herniation had been at the L-4 level. Dr. Levin per-
formed a third surgery to correct Zuniga's back problems on May
4, 2004, this time implementing a spinal fusion using rods and
pedicle screws with prosthetic disc spacers to align the spine in
a normal position. (Tr. 345-50)

Dr. Levin's chart notes from August 2003 through January
2005, detail the healing process that Zuniga underwent following
the third surgery. (Tr. 363-81) Though immediately post-opera-
tion Dr. Levin proscribed work and prescribed physical therapy,
the notes (in reverse order) follow Zuniga's progress in recov-
ery, observing his ability to lift forty to fifty pound objects
occasionally and thus return to work in October 2004. (Tr. 381,
380, 378, 376, 374, 370) On November 29, 2004, Dr. Levin noted
that Zuniga had finished a work conditioning program where it was
determined that he could work at a medium level, perhaps lifting
up to 60 pounds. (Tr. 367) Dr. Levin skeptically noted, "I do
not have a problem with releasing him to work. I have released
him to medium-type duty, but lifting maybe up to 10 pounds
repetitively, but no more than 30 pounds on occasion. . . . I do
not think that Mr. Zuniga will be able to return back to any type

of truck driving or heavy work." (Tr. 367)  Dr. Levin's final chart note dated January 10, 2005, states that the medical treatment had reached its conclusion, estimating Zuniga's Permanent Partial restriction as 34 percent of his person as a whole and again precluding the return to any heavy-type work.  (Tr. 363)

Within this same treatment time, Zuniga sought an independent medical examination on December 8, 2004, from Selim El-Attrache, M.D.  (Tr. 367, 411-22)  Dr. El-Attrache concluded that Zuniga had reached his maximum medical improvement and that no further medical treatment or pain management is necessary.  (Tr. 422)  Dr. El-Attrache continued:

> I do agree with Dr. Levin that Mr. Zuniga can return to work in light to medium work for future gainful, productive employment in commerce and industry with accommodation and modification.  I would restrict Mr. Zuniga from lifting, pushing, pulling and carrying loads beyond 30 pounds on a constant basis. He can sit, walk and stand.  He may bend, stoop, crouch and twist occasionally.  He is to avoid climbing ladders.  The patient examinee agrees with me about these recommendations.

(Tr. 422)

At that time, Dr. El-Attrache gave Zuniga a 26 percent whole person impairment rating.  (Tr. 411)

On June 27, 2005, Zuniga saw Dr. Brian McClenic, M.D., a pain management specialist, on the referral of Dr. Levin.  (Tr. 336)  Dr. McClenic mentioned that Zuniga was taking "just Vicodin" for pain management and Ambien for sleep and suggested controlling his pain with a "long-acting pain medication of some

sort to see if we can control this problem with medication"
before attempting spinal cord stimulation. (Tr. 338-39)

On July 13, 2005, Zuniga was evaluated by Dr. Mark J. Wasy-
lenko, M.D., an orthopedic surgeon. (Tr. 396) Dr. Wasylenko
summarized his physical observations of Zuniga:

> The examinee is an obese, Hispanic-looking
> male who appeared consistently uncomfortable.
> Examination of the hands reveals no
> callouses. He had a cane with him. Weight
> is really quite high. He is 5'8" and 256
> pounds. He states that he is consistently
> increasing his weight due to inactivity.

(Tr. 404)

Dr. Wasylenko's diagnostic conclusions included a finding of
chronic pain syndrome and symptom magnification disorder, noting
that "[s]ymptom magnification behavior was strongly evident."
(Tr. 407) This Evaluation Report includes a comment disagreeing
with Dr. El-Attrache's examination results, finding Zuniga's
impairment at 26 percent, and stating that Zuniga had good
results and good healing from the multiple back surgeries and
fusion. (Tr. 404) Yet, Dr. Wasylenko found a 25 percent impair-
ment of the whole person and defined Zuniga's work capacity as
"at least light-work capacity" as defined by the D.O.T., includ-
ing "exerting up to 20 pounds of force occasionally and/or up to
10 pounds of force frequently and/or a negligible amount of force
constantly to move objects." (Tr. 408) He concluded the report

stating that no diagnostic testing or consultation was indicated
and no further treatment was required. (Tr. 408)

5

Included in the record are duplicate copies of a letter sent by Zuniga's attorney to the ALJ dated February 6, 2006, nine days prior to the hearing. (Tr. 392, 476) The letter lists as attachments medical records from Behzad Aalaei, M.D., Mark Wasylenko, M.D., and Selim El-Attrache, M.D., and prescription records from Walgreens pharmacy, all of which are included in the record. (Tr. 392-426) A latter copy of the letter in the record is accompanied by 19 pages of records from Daybreak Behavioral Health Services which describe Zuniga's individual sessions with a therapist for weekly psychiatric and/or depression treatment, all of which are within the record submitted to the Appeals Council, not the ALJ hearing. (Tr. 477-495) Included after these documents in the record for the Appeals Council is a Mental Impairment Questionnaire with handwritten entries with an illegible signature dated June 20, 2006, which has signs and symptoms checked in reference to Zuniga, as well as four categories of mental abilities and aptitudes (out of 16) for which Zuniga was deemed "Unable to meet competitive standards." (Tr. 499-504) Neither the Daybreak records nor the Mental Impairment Questionnaire were before the ALJ.

At the hearing before the ALJ, Zuniga testified that he continued to experience pain at a level of seven or eight on a ten point scale, with ten representing extreme pain. (Tr. 510) He doubted he could sit in one place for more than ten or 15 minutes. (Tr. 511) Zuniga estimated that he could walk a block. (Tr. 512) He testified that Dr. Levin had prescribed a

cane for him. (Tr. 512-13) Zuniga stated that he was capable of lifting a gallon of milk and carrying it a few steps. (Tr. 513) Zuniga alleged that his back pain interfered with his ability to concentrate. (Tr. 514) He described a very limited lifestyle, stating he "just stay[s] at the house, I don't really move around too much because of the way I feel." (Tr. 516) He also testified that he felt "drugged out" on his medications and really could not understand what was going on at home due to the medications he was taking. (Tr. 516) He stated, "I can't drive," but then explained that he could drive, but did not because he could not sit in one place for more than 15 minutes. (Tr. 518) His attorney asked him if he would drive to his child's school to pick her up, Zuniga twice responded, "[N]o." (Tr. 518) Then, he acknowledged that he did drive at times and did pick up his child, saying, "but most of the time I don't really go anywhere. I stay at home." (Tr. 519) Zuniga explained that he saw a counselor at Daybreak, Carmen Rodriquez, once each week and saw Dr. Zoah, a psychiatrist, at least once each month. (Tr. 520) He described difficulty in climbing up stairs to get to and from his home. (Tr. 525) He estimated that there were 30 steps in three flights to get from the street to his apartment. (Tr. 525) Zuniga reiterated how infrequently he left his house, explaining that he did not leave "unless he really had to." (Tr. 525) He noted that this would happen "maybe once a week when I have to go see my counselor, unless my daughter has to get picked up." (Tr. 526)

7

Mrs. Zuniga testified that in the mornings Zuniga seems "pretty tired." (Tr. 530-31) She mentioned that he could walk a block without the assistance of a cane. (Tr. 531)[2] When asked how often her husband left their house, Mrs. Zuniga replied, "Well, I know he goes and gets the mail and he goes out and gets our daughter from school." (Tr. 531) Mrs. Zuniga testified, "He goes at 3:00 pretty much [e]very day." (Tr. 532) When asked how many steps exist between the sidewalk to the apartment, she estimated 16. (Tr. 532)

Mr. Zuniga's attorney recalled Zuniga so that he could "explain the discrepancy as far as picking up the child." (Tr. 534) When again asked how frequently he picked up his daughter at school, Zuniga eventually responded with "maybe twice or three times out of a week probably." (Tr. 535)

The medical expert, Dr. Miller, testified that it was obvious that Zuniga had experienced back problems due to recurrent herniated discs. (Tr. 537) Dr. Miller opined that Zuniga had reached maximum medical improvement, basing that opinion on a number of reports from several different physicians in the record. (Tr. 537) Dr. Miller specifically referred to the diagnoses of Drs. Levin and El-Attrache as indicating an ability to work. (Tr. 537-38) Dr. Miller also discussed the prognosis

---

[2]Zuniga mistakenly asserts that Mrs. Zuniga "mentioned that the Plaintiff could walk a block with the assistance of a cane." (Plaintiff's Opening Brief in Support of his Complaint at p. 7) However, when asked how far Zuniga could walk "without any assistance," Mrs. Zuniga's answer in the record states, "Well, I know he can't walk too far. He could walk maybe a block or so and then he has to assistance [sic] with the cane, you know. If we go out somewhere he would have to use the cane, if we're planing [sic] on doing some extended walking." Tr. 531.

of Dr. Wasylenko indicating chronic pain syndrome, yet also indicating Zuniga's ability to do light work. (Tr. 539) Dr. Miller testified that a period of a year after his most recent back surgery would be a sufficient time to heal, and then Zuniga "would be capable of light work." (Tr. 537) Since May 2005, one year after Zuniga's third surgery, Dr. Miller stated that he would agree with the assessments of Drs. Levin, El-Attrache, and Wasylenko, and find Zuniga capable of light work. (Tr. 537)

The vocational expert, Tucker, classified all of Zuniga's past work as at least medium in exertion and unskilled, with the exception of his job as a welder which was skilled, and his job as a truck driver which was semi-skilled. (Tr. 541) The ALJ's initial hypothetical question asked Tucker to consider a person of Zuniga's age, education, and past work experience, who was limited to light work that prohibited lifting, climbing ladders, ropes, and scaffolds, and permitted only occasional climbing of ramps and stairs. (Tr. 541) The ALJ limited the hypothetical person to simple, routine, unskilled types work. (Tr. 541) Tucker responded that there were thousands of light jobs in the local area that the hypothetical person could perform. (Tr. 541) Next, the ALJ asked Tucker to retain all the factors of the initial hypothetical question, but to limit the person to light, sedentary work. (Tr. 541) Tucker responded that, at the sedentary level, the hypothetical person could perform 500 local positions as a bench sorter, 700 as a hand packer, and 900 as an order clerk in the Chicago and Northwest Indiana area. (Tr. 542)

Tucker also stated that these jobs would allow for alternating sitting and standing. (Tr. 542)

In her decision, the ALJ found Zuniga disabled from December 2, 2002, the date of his initial back injury, to May 4, 2005, one year after his third and final back surgery. (Tr. 22-23) The ALJ described Zuniga's statements concerning his symptoms of that time period as "generally credible." (Tr. 23) She also reviewed the medical records describing his treatment during that period as well as the medical expert's testimony, all of which corroborate Zuniga's disability during the closed period. (Tr. 23-25) However, the ALJ found that medical improvement occurred as of May 4, 2005, ending Zuniga's disability, clearly stating the basis of her finding of medical improvement:

> The claimant has had three back surgeries. Reports from treating and consulting medical sources denote that *the claimant had reached maximum medical improvement within one year from the date of the May 2004 surgery* and that, despite the claimant [sic] continued assertions of significant pain symptoms and despite the findings on physical examination of limited [sic] of motion of the spine, spasms, and neurological deficits, he could perform work at a light level of physical exertion. The medical expert similarly opined the claimant could perform work at a light level of physical exertion *as of May of 2005.* (emphasis added).
>
> (Tr. 26)

She referred to reports from both treating and consulting medical sources that Zuniga attained maximum medical improvement within one year after his third surgery and the capability of performing

work at a light level, despite his assertions of significant pain. (Tr. 26)  The ALJ agreed with the medical expert that Zuniga no longer had an impairment that met or equaled any listed in the regulations. (Tr. 26)  The ALJ found Zuniga's medical improvement after one year of healing to be related to his ability to work because he no longer was impaired in a way which precluded performance of sedentary work on a sustained or regular basis. (Tr. 26)

She found that beginning on May 4, 2005, Zuniga had the residual functional capacity to perform unskilled, simple, routine sedentary work that did not require climbing of ladders, ropes, or scaffolds or more than occasional kneeling, crouching, stooping, crawling, or climbing of ramps or stairs and which would allow for use of a cane, as well as alternating between sitting and standing every 30 minutes. (Tr. 26)  Here, the ALJ found that Zuniga's statements concerning the ongoing intensity, duration, and limiting effects of his symptoms were not entirely credible. (Tr. 26)  She noted that Zuniga's own doctor recommended a less restrictive residual functional capacity than she found, as well as two independent consulting doctors who also concluded his ability to perform light work, despite his continued pain complaints. (Tr. 26-27)  The ALJ stated that though she did not discount that the claimant had pain, she believed that the claimant had embellished his complaints in order to obtain ongoing disability benefits. (Tr. 27)  The ALJ further explained this finding, noting the inconsistency of Zuniga's professed pain

levels with the daily activities testified to at the hearing,
especially his initial statement that he only went out when
really necessary.  Later in the hearing, Zuniga stated that he
went to see a counselor once a week since the Summer of 2005,
picked up his daughter at school two or three times each week,
and visited his psychiatrist once every three or four weeks.
(Tr. 28)  The ALJ specifically found it "difficult to give full
credibility to his claims of significantly reduced daily activi-
ties . . . ."  (Tr. 28)

Despite finding Zuniga not completely credible, the ALJ
accepted his testimony as to pain and limited functionality:

> [H]e is limited to sedentary work with [sic]
> involves unskilled, simple, routine tasks,
> which does not require climbing of ladders,
> ropes or scaffolds or more than occasional
> kneeling, crouching, stooping, crawling, or
> climbing of ramps or stairs, which would
> allow for the use of a cane, and which would
> allow him to alternate between sitting and
> standing every 30 minutes.

> (Tr. 28)

The ALJ found that after May 4, 2005, Zuniga was significantly
limited in his ability to perform basic work activities, preclud-
ing him from returning to past work, but that based on his age,
education, work experience, and residual functional capacity, he
was able to perform a significant number of jobs in the national
economy.  (Tr. 28-29)

## Discussion

The standard for judicial review of an ALJ's finding that a
claimant is not disabled within the meaning of the Social Secu-

rity Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The claimant must show that he is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A)

The Social Security regulations enumerate the five-step sequen-
tial evaluation to be followed when determining whether a claim-
ant has met the burden of establishing disability.  20 C.F.R.
§404.1520.  The ALJ first considers whether the claimant is
presently employed or "engaged in substantial gainful activity."
20 C.F.R. §404.1520(b).  If he is, the claimant is not disabled
and the evaluation process is over; if he is not, the ALJ next
addresses whether the claimant has a severe impairment or combi-
nation of impairments which "significantly limits . . . physical
or mental ability to do basic work activities."  20 C.F.R.
§404.1520(c).  Third, the ALJ determines whether that severe
impairment meets any of the impairments listed in the regula-
tions.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it does,
then the impairment is acknowledged by the Commissioner to be
conclusively disabling.  However, if the impairment does not so
limit the claimant's remaining capabilities, the ALJ reviews the
claimant's "residual functional capacity" (RFC) and the physical
and mental demands of his past work.  If, at this fourth step,
the claimant can perform his past relevant work, he will be found
not disabled.  20 C.F.R. §404.1520(e).  However, if the claimant
shows that his impairment is so severe that he is unable to
engage in his past relevant work, then the burden of proof shifts
to the Commissioner to establish that the claimant, in light of
his age, education, job experience and functional capacity to

work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §404.1520(f).

If it is determined that the claimant was disabled for a period of time, and the question is whether he continues to be disabled, then an eight-step evaluation is performed.  *See* 20 C.F.R. §404.1594(f). *See also* **Jones v. Shalala**, 10 F.3d 522 (7th Cir. 1993); **Lewis v. Barnhart**, 201 F.Supp.2d 918, 930 (N.D. Ind. 2002).  For continuing disability, if the claimant's impairment no longer meets or equals the severity of one listed in the Appendix, the next question is whether there has been medical improvement as shown by a decrease in medical severity.  20 C.F.R. §404.1594(f)(3); **Lewis**, 201 F.Supp.2d at 930.  If there has been medical improvement, the ALJ must determine if the improvement is related to the claimant's ability to work, which may be shown by determining if there was an increase in the claimant's RFC based on the impairment that was present at the time of the most recent favorable medical determination.  20 C.F.R. §404.1594(f)(4).  If medical improvement is shown to be related to work, the ALJ must determine whether all of the claimant's current impairments in combination are sever, and if so, do they significantly limit the ability to do basic work activities.  20 C.F.R. §404.1594(f)(6).  The last two steps involve determining whether the claimant has the ability to engage in "substantial gainful activity, but looking at whether he can still do the work he did in the past, and if not, whether

he has the RFC considering his age, education and past work experience to perform other work." 20 C.F.R. §404.1594(f)(7)-(8).

Zuniga faults the ALJ for an improper determination of medical improvement under the 20 C.F.R. §404.1594(f) scheme and a lack of substantial evidence of medical improvement. He argues that the segment of the eight-step inquiry comparing evidence of his RFC at the time of the hearing with evidence of that impairment present within the closed time period in which he was deemed disabled does not evince a showing of medical improvement, but in fact, that it shows an increase in his impairment.

In *Lewis*, a case cited by Zuniga, the claimant likewise suffered from chronic back pain that required surgeries. 201 F.Supp.2d at 924. In that case, the ALJ determined that the claimant was disabled for a closed period of time, but found that following successful surgery and recovery, the claimant no longer was impaired and could perform a limited range of light work. *Lewis*, 201 F.Supp.2d at 932. The cut-off date used by the ALJ to end the disability period was the date that the claimant visited his treating physician two months after surgery when the doctor declared the claimant's prognosis as excellent, thinking that he could return to work in three or four months. *Lewis*, 201 F.Supp.2d at 935. The claimant actually was not released to return to work until three months later. Because the reviewing court could not find any evidence that the claimant had been released to return to work at the earlier date, substantial evidence was not found to support the ALJ's decision. *Lewis*,

201 F.Supp.2d at 935.  Though the date used by the ALJ to determine the end of the closed disability period was mistaken, the ALJ analyzed successfully the information in a way which satisfied the medical improvement evaluation of 20 C.F.R. §404.1594(f).  The ALJ correctly noted that the surgery was successful and that after recovery the claimant displayed an RFC which allowed him to work.  *Lewis*, 201 F.Supp.2d at 932.

Here, the ALJ clearly followed the eight-step evaluation guidelines of 20 C.F.R. §404.1594(f), citing evidence to support each step of the process.  Zuniga, however, contends that a review of the available evidence shows no medical improvement, or at best, similar findings from within the closed period and after.  He bases this contention on selected portions of the medical evidence rather than from viewing the record as a whole. The ALJ clearly stated the basis of her finding of medical improvement.

The error of Zuniga's argument is that it compares information from points of time months after his final surgery, yet within the closed period, with information garnered after the closed period had ended, without consideration of the healing that had occurred in the four to eight months after the May 2004 surgery, which shows marked improvement from his pre-surgery condition.  Dr. Levin, in his surgery follow-up visits from October 2004 to January 2005, noted that Zuniga could return to work and occasionally lift 40 to 50 pound objects, then increased that limit to "perhaps" up to 60 pounds, though clarifying that a

limit of ten pounds on a repetitive bases was appropriate.[3]  Dr. Levin's final post-operative notes from the January 10, 2005, visit state that Zuniga had reached the conclusion of his medical treatment and estimated his total impairment as 34 percent.  In December 2004, Dr. El-Attrache also concluded that Zuniga had reached his maximum medical improvement, assigning a 26 percent impairment to him.  Dr. Wasylenko's summary of his July 13, 2005, evaluation of Zuniga stated impairment at 25 percent and recom- mended "at least light-work capacity," including "exerting up to twenty pounds of force occasionally and/or up to ten pounds of force frequently . . . ," concluding that no further treatment was necessary.

To show a lack of medical improvement, Zuniga chose to extract isolated findings of specific physicians relating to degrees of flexion, extension, and straight leg raising that are reported at lower percentages by Dr. McClenic one month after the closed disability period than as reported by Dr. El-Attrache within the closed disability period.  Secondly, Zuniga also chose to focus on the weight lifting limitations imposed by the differ-

---

[3]The Opening Brief of plaintiff restates these clinical findings of Dr. Levin concerning the suggested weight limits for lifting as follows: "Dr. Levin released the plaintiff to 'medium-type duty with lifting [] no more than 30 pounds on occasion."  (Brief at p. 15)  It is important to note that reinserting the edited portion to reflect the record adjusts the meaning markedly: "[H]e released him to medium-type duty, with lifting *maybe up to 10 pounds repetitively, but* no more than 30 pounds on occasion."  (Tr. 24) (emphasis added).  This correction weakens the contrast that the Brief por- trays between the prognosis given by Dr. Levin within the disability period with that given by Dr. Wasylenko after the closed period concluding that Zuniga was capable of at least light work capacity, including "exerting up to 20 pounds of force occasionally and/or up to 10 pounds of force frequently . . . ."  (Tr. 408)

ent physician evaluations. He mistakenly portrayed Dr. Levin's limit at a flat 30 pounds from within the closed disability period, reported Dr. El-Attrache's limit given within the closed period as 30 pounds, but contrasted Dr. Wasylenko's limitation given after the closed period as 20 pounds on occasion. Third, Zuniga compared whole body impairment percentages to show, at the very least, his prognosis did not improve from an evaluation within the closed time period and one after, citing the 26 percent impairment rating given by Dr. El-Attrache in December 2004 and the 25 percent impairment rating given by Dr. Wasylenko in July 2005.

All three methods of disputing the medical improvement must fail. First, the flexion, extension, and leg raising percentages that are contrasted are a minor set of findings within larger medical conclusions. All of this information was used to determine Zuniga's readiness to re-enter the workforce, a conclusion that was unanimous among all physicians in the record. Second, the extraction of selective weight-lifting limits to portray them as decreasing from 30 pounds in November 2004 to 20 pounds in July 2005 is misleading. A review of the whole record, including all the weight limitations, was included in the ALJ's decision. A more accurate summation of the different physicians' reports shows that both Dr. Levin in November 2004 and Dr. Wasylenko in July 2005 recommend a limitation of ten pounds repetitively, a limitation that was accounted for in the hypothetical to the vocational expert which specified light work that prohibited

lifting.  Third, the comparison of the 26 percent whole body impairment given in December 2004 to the 25 percent impairment rating of July 2005 to show no improvement neglects to include Dr. Levin's estimation of 34 percent impairment from January 2005.  The inclusion of the larger impairment estimate given by Zuniga's treating physician within the disability period contrasted with the 25 percent impairment estimate subsequent to the disability period gives a clear depiction of medical improvement. All three impairment ratings were noted by the ALJ in her decision, and her consideration of all three, rather than Zuniga's suggestion that only two be isolated and compared, substantially supports the finding of medical improvement.

Zuniga cites *Yousif v. Chater* for the proposition that an ALJ cannot find medical improvement when the findings within and without the closed period are similar.  However, the facts in *Yousif* are quite different than this case.  There, the ALJ <u>only</u> cited similar findings in the decision finding medical improvement.  *See* 901 F.Supp. 1377, 1386-87 (N.D. Ill. 1995) ("Here a before and after comparison is directly available . . . .  Side-by-side comparison . . . shows graphically that the later report does not exhibit medical improvement.  Indeed, the two reports

are virtually identical, with language from one repeated verbatim in the other.").  As discussed, that is not the case here.

The court notes the difficulty in *Lewis,* as exists here, of the retrospective determination of the end of a closed disability

20

period.  In *Lewis*, the ALJ mistakenly chose a date too early in the claimant's healing process and was reversed on that point. Here, the ALJ clearly explained that she followed the medical expert's opinion that recovery from the type of back surgery in question could take up to one year.  Frankly, her findings were generous in this regard when compared with the recommendation of Zuniga's treating physician that he could return to medium to light work in November 2004.  The attempt to use this isolated medical information from the visit that elicited such a conclusion and compare it with much later data from a physician who also notes strong evidence of symptom magnification behavior is ineffective.

Zuniga also claims that the ALJ disregarded records of his mental status and depression and his Mental Impairment Questionnaire from Daybreak Behavioral Health Services.  He asserts that these records were ignored.  In *Schmidt*, 395 F.3d at 737, a similar situation occurred wherein a claimant asked the district court to consider three forms of "new" evidence that was not before the ALJ at the time of the hearing.  The Seventh Circuit reviewed the circumstances which require a review of new evidence, namely, "upon a showing that there exists new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 395 F.3d at 741-42 (*citing* 42 U.S.C. §405(g); *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997)).  "New" was defined as non-existent or unavailable to the claimant at the time of the

administrative proceeding. *Schmidt*, 395 F.3d at 742. "Material" was defined as giving a "reasonable probability" that the ALJ would have reached a different conclusion had the evidence been considered. *Schmidt*, 395 F.3d at 742 (citing *Johnson v. Apfel*, 191 F.3d 770, 776 (7th Cir. 1999)). In *Schmidt*, medical records and a mental impairment questionnaire which reflected tests and treatment subsequent to the ALJ's hearing and decision were deemed neither new nor material. *Schmidt*, 395 F.3d at 742 ("None of the proffered evidence speaks to Schmidt's condition as it existed at or prior to the time of the administrative hearing. . . . [M]edical records postdating the hearing and that speak only to the applicant's current condition, not to his condition at the time his application was under consideration by the Social Security Administration do not meet the standard for new and material evidence."); 20 C.F.R. §404.970(b) (Appeals Council will consider new and material evidence "if it relates to the period on or before the date of the administrative law judge hearing decision."). Next, *Schmidt* considered the use of employment records that undisputedly existed and were available to the claimant at the time of the hearing, but which were inexplicably not provided to the ALJ for review. These existing and available records could not be defined as "new." *Schmidt*, 395 F.3d at 742-43 ("The employment records were in existence and available to [the claimant] at the time of the administrative proceeding, and he was given ample opportunity to submit them both before and after the hearing. This evidence is not new and no good cause

has been demonstrated for the failure to incorporate it into the administrative record.").

Here, the records from Daybreak and the Mental Impairment Questionnaire only appeared in the case record for the Appeals Council review, not in the records submitted for the hearing before the ALJ.  Though the cover letter accompanying the Daybreak records is dated nine days prior to the hearing, the letter appears to be a copy of the letter used as a cover to the earlier fax to the ALJ which contained records from Drs. Aalaei, Wasylenko, and El-Attrache, and prescription records from Walgreens, and the letter mentions nothing in its list of enclosures that corresponds to the Daybreak records.  There is no evidence that the Daybreak records were submitted prior to the ALJ hearing.  Like the employment records in *Schmidt*, the Daybreak records are dated from August 2005 to January 2006 – predating the February 15, 2006 hearing and the April 25, 2006 decision of the ALJ.  These records were in existence and available to Zuniga before the hearing and as such, are not new.  Likewise, the Mental Impairment Questionnaire mimics the medical records and mental impairment questionnaire in *Schmidt*, in that it post-dates the hearing and decision dates.  These records do not speak to Zuniga's condition at the time of the hearing and cannot be material.  Therefore, neither source of information meets the standard for new and material evidence and cannot stand as a basis to discredit the ALJ's decision.

Zuniga also asserts that the ALJ failed to appreciate the

23

pain syndrome that he suffered from, both by misunderstanding that his pain was psychological rather than physical and by improperly discounting his credibility.

This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles his opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's deci-sion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and

other evidence."  20 C.F.R. §404.1529(a); ***Arnold v. Barnhart***, 473

F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be

accepted insofar as they clash with other, objective medical

evidence in the record."); ***Scheck v. Barnhart***, 357 F.3d 697, 703

(7th Cir. 2004).  If the claimant's impairments reasonably could

produce the symptoms of which the claimant is complaining, the

ALJ must evaluate the intensity and persistence of the claimant's

symptoms through consideration of the claimant's "medical his-

tory, the medical signs and laboratory findings, and statements

from [the claimant, the claimant's] treating or examining physi-

cian or psychologist, or other persons about how [the claimant's]

symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); ***Schmidt,***

395 F.3d at 746-47 ("These regulations and cases, taken together,

require an ALJ to articulate specific reasons for discounting a

claimant's testimony as being less than credible, and preclude an

ALJ from merely ignoring the testimony or relying solely on a

conflict between the objective medical evidence and the claim-

ant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally

unsupported by the medical evidence, the ALJ may not make a

credibility determination "solely on the basis of objective

medical evidence."  SSR 96-7p, at *1.  *See also* ***Indoranto v.***

***Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004); ***Carradine v. Barn-***

***hart***, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling,

the fact that its source is purely psychological does not disen-

title the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a signifi-
> cant factor of his or her alleged inability
> to work, the ALJ must obtain detailed de-
> scriptions of the claimant's daily activities
> by directing specific inquiries about the
> pain and its effects to the claiming.  She
> must investigate all avenues presented that
> relate to pain, including claimant's prior
> work record, information and observations by
> treating physicians, examining physicians,
> and third parties.  Factors that must be
> considered include the nature and intensity
> of the claimant's pain, precipitation and
> aggravating factors, dosage and effectiveness
> of any pain medications, other treatment for
> relief of pain, functional restrictions, and
> the claimant's daily activities.  (internal
> citations omitted).

> *Luna v. Shalala*, 22 F.3d 687, 691 (7th
> Cir. 1994)

*See also* ***Zurawski v. Halter***, 245 F.3d 881, 887-88 (7th Cir.
2001).

In addition, when the ALJ discounts the claimant's descrip-
tion of pain because it is inconsistent with the objective
medical evidence, she must make more than "a single, conclusory
statement . . . .  The determination or decision must contain
specific reasons for the finding on credibility, supported by the
evidence in the case record, and must be sufficiently specific to
make clear to the individual and to any subsequent reviewers the
weight the adjudicator gave to the individual's statements and
the reasons for that weight."  SSR 96-7p, at *2.  *See Zurawski*,
245 F.3d at 887; ***Diaz v. Chater***, 55 F.3d 300, 307-08 (7th Cir.
1995) (finding that the ALJ must articulate, at some minimum
level, his analysis of the evidence).  She must "build an accu-
rate and logical bridge from the evidence to her conclusion."

*Zurawski*, 245 F.3d at 887 (*quoting* **Clifford**, 227 F.3d at 872).
When the evidence conflicts regarding the extent of the claim-
ant's limitations, the ALJ may not simply rely on a physician's
statement that a claimant may return to work without examining
the evidence the ALJ is rejecting.  *See* **Zurawski**, 245 F.3d at 888
(*quoting* **Bauzo v. Bowen**, 803 F.2d 917, 923 (7th Cir. 1986))("Both
the evidence favoring the claimant as well as the evidence favor-
ing the claim's rejection must be *examined*, since review of the
substantiality of evidence takes into account whatever in the
record fairly detracts from its weight.") (emphasis in original).

    In the case at hand, the ALJ's findings discuss in detail
the indications of both chronic pain syndrome and symptom magni-
fication diagnosed by Dr. Wasylenko.  Also reflected is the
finding that Zuniga's professed pain was inconsistent with his
daily activities.  His conflicted testimony concerning his
difficulty in climbing the numerous stairs to his apartment and
the equivocation about his inability to pick up his daughter from
school are cited as sources of the ALJ's difficulty in giving
full credibility to his claims.  The finding of a lack of credi-
bility is not patently wrong; it is based on explicit findings
considered after thorough examination of Zuniga's objective medi-
cal evidence, all which are well-explained in the ALJ's decision.
Likewise, the ALJ effectively articulated her analysis of Zuni-
ga's entire medical history, discussing all of the evidence
before her, acknowledging Zuniga has pain, but believing that he
embellished his complaints in order to obtain ongoing disability

benefits.  Regardless of her belief in his complaints, ultimately the ALJ accepted his testimony as to his pain and limited his functional abilities accordingly - well within the limits given by each physician of record in the case.

The ALJ thoroughly considered and explained her findings and conclusions, detailing the source of each finding and the path from these findings to her final conclusions:  the award of Disability Benefits for a closed period between Zuniga's injury of December 2, 2002, and May 5, 2005, one year after his final, successful surgery, and an acknowledgment that the remaining pain limited his job choices to sedentary occupations.

————————

For the aforementioned reasons, pursuant to Sentence Four of 42 U.S.C. §405(g), the decision of the Commissioner is **AFFIRMED.** The Clerk is **DIRECTED TO CLOSE** the case.

ENTERED this 22nd day of September, 2008

s/ ANDREW P. RODOVICH
United States Magistrate Judge